## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | Chapter 15 |
| METINVEST B.V.,[1] | Case No.  16-11424 (LSS) |
| Debtor in a Foreign Proceeding. | **Ref. Docket No. 2** |

## <u>NOTICE OF ENTRY OF SANCTION ORDER</u>

On June 30, 2016, the High Court of Justice of England and Wales entered the attached order in the proceeding concerning a scheme of arrangement under part 26 of the English Companies Act 2006 with respect to the above-captioned chapter 15 debtor.

Dated: Wilmington, Delaware
       June 30, 2016

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

By: */s/ Joseph M. Barry*
Joseph M. Barry (Del. Bar No. 4221)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone (302) 571-6600

-and-

**ALLEN & OVERY LLP**
Daniel Guyder
Mark Nixdorf
1221 Avenue of the Americas
New York, New York 10020
Telephone (212) 610-6300

*Attorneys for the Foreign Representative of the Debtor*

---

[1]    The last four digits of the Metinvest B.V. United States Tax Identification Number are 3839.  The address of the registered office of Metinvest B.V. is Alexanderstraat 23, 2514 JM, The Hague, Netherlands.





Claim No. CR-2016-003062

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

**THE HONOURABLE** M̲R̲ **JUSTICE** A̲R̲N̲O̲L̲D̲

**THURSDAY THE 30th DAY OF JUNE 2016**

**IN THE MATTER OF METINVEST B.V.**

**AND IN THE MATTER OF THE COMPANIES ACT 2006**

---

### ORDER

---

**UPON THE APPLICATION** by Part 8 Claim Form dated 6 June 2016 (the "**Claim Form**") of the Claimant, Metinvest B.V. (the "**Company**") whose registered office is Nassaulaan 2A, 2514 JS, 'S-Gravenhage, The Netherlands for the sanctioning of the scheme of arrangement as set out in the Schedule hereto (the "**Scheme**")

**AND UPON HEARING** David Allison QC as Leading Counsel and Stephen Robins as Junior Counsel for the Company

**AND UPON READING** the Claim Form and the evidence recorded on the Court File as having been read

**THE COURT HEREBY SANCTIONS** the Scheme

**AND IT IS ORDERED** that the Company or its solicitors do deliver, as soon as reasonably practicable, an office copy of this Order to the Registrar of Companies for England & Wales.

**DATED** the 30th day of June 2016

The court has provided a sealed copy of this order to the serving party:

Allen & Overy LLP (ref: Mark Sterling)

One Bishops Square

London, E1 6AD

Tel: +44 (0) 20 3088 0000



**SCHEDULE**

**The Scheme**



**THE SCHEME**

**Claim No. CR-2016-003062**

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**COMPANIES COURT**

### IN THE MATTER OF METINVEST B.V.

and

### IN THE MATTER OF THE COMPANIES ACT 2006

_____

**SCHEME OF ARRANGEMENT**
**(under Part 26 of the Companies Act 2006)**

between

**METINVEST B.V.**

and

**THE SCHEME CREDITORS**
**(as hereinafter defined)**

1

## Table of Contents

**Clause**                                                                                               **Page**

1.    Definitions and Interpretation .........................................................................................................3
2.    Recitals .......................................................................................................................................12
3.    The Scheme .................................................................................................................................13

**Schedule**

1.    Scheme Undertakings.....................................................................................................................23
2.    Form of Deed of Waiver and Release .............................................................................................26
3.    Non-Binding Restructuring Heads of Terms...................................................................................34
4.    Principal Transaction Documents...................................................................................................51
      Part 1      First Principal Transaction Documents........................................................................51
      Part 2      Second Principal Transaction Documents ....................................................................51
      Part 3      Third Principal Transaction Documents .......................................................................52

1.   **DEFINITIONS AND INTERPRETATION**

1.1   In this Scheme, unless inconsistent with the subject or context, the following expressions shall have the following meanings:

**2016 Note Trustee** means BNY Mellon Corporate Trustee Services Limited in its capacity as trustee under the relevant Trust Deed for the 2016 Notes and any successor thereto as provided thereunder.

**2016 Notes** means the 10.25 per cent. guaranteed notes due 2016 (of which U.S.$88,477,264.89 was outstanding as at 27 May 2016 after capitalisation of unpaid interest in accordance with the First Moratorium Scheme) issued by the Company (Regulation S Notes ISIN: XS0511379066, Common Code: 051137906, Rule 144A Notes ISIN: US591555AA54, CUSIP: 591555AA5).

**2017 Note Trustee** means GLAS Trust Corporation Limited in its capacity as trustee under the relevant Trust Deed for the 2017 Notes and any successor thereto as provided thereunder.

**2017 Notes** means the 10.50 per cent. guaranteed notes due 2017 (of which U.S.$300,531,520.44 was outstanding as at 27 May 2016 after capitalisation of unpaid interest in accordance with the First Moratorium Scheme) issued by the Company (Regulation S Notes ISIN: XS1145219652, Common Code: 114521965, Rule 144A ISIN: US591555AC11, Common Code: 114752894, CUSIP: 591555 AC1).

**2018 Note Trustee** means GLAS Trust Corporation Limited in its capacity as trustee under the relevant Trust Deed for the 2018 Notes and any successor thereto as provided thereunder.

**2018 Notes** means the 8.75 per cent. guaranteed notes due 2018 (of which U.S.$786,774,642.39 was outstanding as at 27 May 2016 after capitalisation of unpaid interest in accordance with the First Moratorium Scheme) issued by the Company (Regulation S Notes ISIN: XS0591549232, Rule 144A ISIN: US591555AB38, CUSIP: 591555 AB3).

**Account Holder** means any person recorded directly in the records of a Clearing System as holding an interest in any Notes in an account with the relevant Clearing System either for its own account or on behalf of its client including, for the avoidance of doubt, any DTC Participant.

**Account Holder Letter** has the meaning given to that term in Appendix 1 (*Definitions and Interpretation*) of the Explanatory Statement of which this Scheme forms part.

**Additional Scheme Consideration** means the August Moratorium Fee, the September Moratorium Fee, the October Moratorium Fee and the November Moratorium Fee to the extent payable pursuant to the terms of this Scheme.

**August Moratorium Fee** means an amount of U.S.$0.75 per U.S.$1,000 principal amount of Notes held by each relevant Noteholder as at 29 July 2016.

**Business Day** means a day which is a day on which commercial banks and foreign exchange markets settle payments and are open for general business (including dealings in foreign exchange and foreign currency deposits) in Kyiv, Amsterdam, London and New York.

**Clearing Systems** means DTC, Clearstream, Luxembourg and Euroclear.

**Clearstream, Luxembourg** means Clearstream Banking, *société anonyme*.

3

**Common Depositaries** means Cede & Co. as nominee of DTC and The Bank of New York Mellon, London branch as the common depositary for Clearstream, Luxembourg and Euroclear, in each case with whom the Global Notes have been deposited.

**Companies Act** means the Companies Act 2006.

**Company** means Metinvest B.V. incorporated in the Netherlands as a private limited company (*besloten vennootschap met beperkte aansprakelijheid*) with trade register number 24321697 on 21 May 2001.

**Court** means the High Court of Justice of England and Wales.

**Declared Default** means:

(a)     any Event of Default arising under any of the Notes as a result of:

   (i)     the failure by the Company and/or any of the Guarantors and/or any of their respective Subsidiaries to pay when due any Indebtedness in respect of:

   (A)     any amount falling due under the PXF Facilities in the period from 1 January 2015 until 30 November 2016, inclusive (a **PXF Payment Default**);

   (B)     any amount falling due under any Intra-group Facilities during the period from 1 January 2015 until 30 November 2016, inclusive (an **Intra-group Default**);

   (C)     any amount falling due under any of the Notes in the period from 31 January 2016 to 30 November 2016, inclusive (a **Notes Payment Default**);

   (D)     any amount falling due under the Seller Notes in the period from 31 January 2016 to 30 November 2016, inclusive (a **Seller Notes Payment Default**);

   (E)     any amount falling due under the Shareholder Loans in the period from 1 January 2015 to 30 November 2016, inclusive (a **Shareholder Loans Payment Default**); or

   (ii)     the failure by the Company and/or any of the Guarantors and/or any of their respective Subsidiaries to pay when due any amounts payable under any guarantee for or indemnity in respect of Indebtedness referred to in sub-paragraph (i) above,

   in each case (A) including, for the avoidance of doubt, any such failure by Ilyich I&SW in respect of the Ilyich Suretyships; and (B) excluding any Event of Default occurring under Condition 8(c)(i) of the 2016 Notes, Condition 10(c)(i) of the 2017 Notes and Condition 10(c)(i) of the 2018 Notes if, by reason of any PXF Payment Default, any Intra-group Default, any Notes Payment Default, Seller Notes Payment Default or any Shareholder Loans Payment Default, any lenders under the PXF Facilities or holders of the Seller Notes (or any agent or trustee on their behalf), any lenders under the Intra-group Facilities or the Shareholder Loans exercise their right under the PXF Facilities, the Intra-group Facilities, the Seller Notes or the Shareholder Loans (as applicable) to declare the loans made by them under the relevant Indebtedness to be due and payable prior to their stated maturity date;

(b)     any Event of Default arising under Condition 8(g)(i)(D) of the 2016 Notes, Condition 10(g)(i)(D) of the 2017 Notes or Condition 10(g)(i)(D) of the 2018 Notes as a result of any

meeting of bondholders, lenders and other creditors of the Company, the Guarantors or any Material Subsidiary being convened for the purpose of considering an amicable settlement of their claims;

(c)   any Event of Default arising under Condition 8(g)(ii)(A) of the 2016 Notes, Condition 10(g)(ii)(A) of the 2017 Notes or Condition 10(g)(ii)(A) of the 2018 Notes as a result of the Company, Guarantors or any Material Subsidiary failing or being unable to pay its debts generally as they become due following the occurrence of any of the events set out in paragraph (a) of this definition;

(d)   any Event of Default arising under Condition 8(h) of the 2016 Notes, Condition 10(h) of the 2017 Notes or Condition 10(h) of the 2018 Notes in respect of Yenakiieve I&SW ceasing or threatening to cease to carry on all or substantially all of its business or operations;

(e)   any Event of Default arising under Condition 8(b) of the 2016 Notes, Condition 10(b) of the 2017 Notes or Condition 10(b) of the 2018 Notes arising as a result of a breach by the Company or any of its Subsidiaries of Condition 3.2 of the 2016 Notes, Condition 4(c) of the 2017 Notes or Condition 4(b) of the 2018 Notes in connection with the Incurrence of any Indebtedness by the Company or any of its Subsidiaries (directly or indirectly) under:

    (i)   receivables financings, factoring financings, forfaiting transactions, discounting transactions or any other trade finance facilities (other than those referred to in paragraph (ii) below) provided that the aggregate total amount of such Indebtedness of the Company or any of its Subsidiaries outstanding at any one time does not exceed U.S.$600,000,000; and

    (ii)   documentary facilities including, without limitation, letters of credit, documentary credits and advance payment bonds,

in each case, incurred in the ordinary course of business;

(f)   any Event of Default arising under either Condition 8(c) and 8(f) of the 2016 Notes, Condition 10(c) and 10(f) of the 2017 Notes or Condition 10(c) and 10(f) of the 2018 Notes or, in relation to paragraph (ii) below only, any Event of Default arising under Condition 8(d) and 8(e) of the 2016 Notes, Condition 10(d) and 10(e) of the 2017 Notes or Condition 10(d) and 10(e) of the 2018 Notes, as a result of:

    (i)   a judgment in the amount of UAH 1,032,899,117.30 (equivalent to U.S.$41,043,433.01 as at 31 May 2016[1]) in favour of KRIOW against Ilyich I&SW for recovery of debt for supplied raw materials or any other court judgment connected with the relevant proceedings or such debt and a failure to pay such debt; or

    (ii)   a judgment in the amount of UAH 276,021,884.71 (equivalent to U.S.$10,968,046.68 as at 31 May 2016) in favour of KRIOW against Yenakiieve I&SW for recovery of debt under an agency agreement or any other court judgment or enforcement proceedings connected with the relevant proceedings or such debt and a failure to pay such debt,

---

[1]   Note: The conversion of UAH into U.S. dollars in paragraphs (f)(i) and (ii) of this definition is indicative only and is calculated on the basis of the official exchange rate of UAH against the U.S. dollar as quoted by the National Bank of Ukraine on 31 May 2016. However, Condition 8(f) of the 2016 Notes, Condition 10(f) of the 2017 Notes and Condition 10(f) of the 2018 Notes provide that the relevant calculations to determine the day when an Event of Default under such Conditions has occurred are to be made on the basis of the middle spot rate for the relevant currency against the U.S. dollar as quoted by any leading bank on such day.

provided that the relevant judgments referred to in paragraphs (i) and (ii) above do not exceed, in the aggregate, an amount equivalent to U.S.$75,000,000 converted in accordance with the terms and conditions of the Notes;

(g)    any Event of Default arising under Condition 8(b) of the 2016 Notes, Condition 10(b) of the 2017 Notes or Condition 10(b) of the 2018 Notes as a result of a breach of Clause 6.13 of the 2016 Notes Trust Deed, Clause 8.13 of the 2017 Notes Trust Deed or Clause 8.13 of the 2018 Notes Trust Deed; or

(h)    any Event of Default arising under any of the Notes as a result of a breach of Clause 3.3(a) by a Scheme Creditor.

**Deed of Waiver and Release** means the deed of waiver and release substantially in the form set out in Schedule 2 (*Form of Deed of Waiver and Release*).

**Determination Date** has the meaning given to that term in paragraph 4 of Schedule 1 (*Scheme Undertakings*).

**DTC** means The Depository Trust Company.

**DTC Participant** means a person recorded directly in the records of Cede & Co. and DTC as holding an interest in any Notes in an account held with DTC.

**Early Termination Date** has the meaning given to that term in Clause 3.6.

**Early Termination Notice** has the meaning given to that term in Clause 3.6.

**Euroclear** means Euroclear Bank S.A./N.V. as operator of the Euroclear clearing system.

**Event of Default** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Extension Notice** has the meaning given to that term in Clause 3.5(b).

**First Moratorium Scheme** means the scheme of arrangement in respect of the Company under Part 26 of the Companies Act sanctioned by the Court on 29 January 2016.

**First Moratorium Scheme Capitalised Interest** has the meaning given to that term in Clause 3.3(c).

**First Principal Transaction Documents** means the documents referred to as such in Part 1 of Schedule 4 (*Principal Transaction Documents*).

**Global Notes** has the meaning given to that term in Clause 2.2(a)(ii).

**Group** means the Company and its consolidated Subsidiaries.

**Guarantee** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Guarantors** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Ilyich I&SW** means Private Joint Stock Company Ilyich Iron and Steel Works of Mariupol (Ukraine), otherwise known as MMK Illycha, a company organised and existing under the laws of

Ukraine, identification code 00191129, whose registered office is at 1 Levchenka Street, Mariupol, Donetsk Region, 87504, Ukraine.

**Ilyich Notes Suretyships** means suretyships granted by Ilyich I&SW by way of deed poll in favour of the 2016 Note Trustee, the 2017 Note Trustee and the 2018 Note Trustee dated 1 April 2016 to guarantee the due payment of all sums expressed to be payable by the Company under the applicable series of Notes and the provisions of the applicable trust deed insofar as they relate to those Notes.

**Ilyich PXF Suretyships** means suretyships initially granted on 21 December 2015 (as amended and restated on 1 April 2016) by Ilyich I&SW in favour of the PXF Lenders to guarantee the liabilities of the Company under the PXF Facilities.

**Ilyich Suretyships** means the Ilyich Notes Suretyships and the Ilyich PXF Suretyships.

**Incurred** and **Incurrence** have the meaning given to those terms in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Indebtedness** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Information Agent** means Lucid Issuer Services Limited.

**Initial Scheme Consideration** means an amount of U.S.$0.50 per U.S.$1,000 principal amount of Notes held by each relevant Noteholder as at the Record Date.

**Interest Trust Account** means any English law governed trust account to be established by or on behalf of the Company for the purposes of holding funds for the benefit of the Noteholders as contemplated by paragraph 8 of Schedule 1 (*Scheme Undertakings*).

**Intra-group Facilities** means any Indebtedness owing by the Company, any Guarantor or any Subsidiary of the Company or a Guarantor to any other member of the Group.

**Irish Stock Exchange** means the Irish Stock Exchange plc.

**KRIOW** means Public Joint Stock Company Krivoj Rog's Iron-Ore Combine (Ukraine), otherwise known as Public Joint Stock Company "Kryvyi Rih Iron Ore Works", a company organised and existing under the laws of Ukraine, identification code 00191307, whose registered office is at 1A Simbirtseva Street, Kryvyi Rih, Dnipropetrovsk Region, 50029 Ukraine.

**Liability** or **Liabilities** means any debt, liability or obligation of a person whether it is present, future, prospective or contingent, whether it is fixed or undetermined, whether or not it involves the payment of money or performance of an act or obligation and whether it arises at common law, in equity or by statute, in England and Wales or any other jurisdiction, or in any manner whatsoever.

**Longstop Date** means the date falling 10 days after the Scheme Effective Date.

**Majority Noteholder Request Notice** means a notice delivered to the Company by Noteholders in accordance with Clause 3.5(b) and Clause 3.6 pursuant to which Noteholders holding at least 50.01% of the aggregate principal outstanding amount of the Notes as at the date of the notice provide confirmations in writing to the Company as to their aggregate holdings of the Notes (accompanied by evidence as to such holdings from their custodians and/or Euroclear and Clearstream, Luxembourg in the form agreed between the Company and the legal and financial advisers to the Noteholder Committee, each acting reasonably).

7

**Material Subsidiary** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Monthly Report** has the meaning given to that term in paragraph 2 of Schedule 1 (*Scheme Undertakings*).

**Moratorium Period** means the period commencing on the Scheme Effective Date and ending on the Termination Date.

**Non-Binding Restructuring Heads of Terms** means the non-binding heads of terms for a restructuring of the Notes and the PXF Facilities agreed on 24 May 2016 between the Company, the Noteholder Committee and the PXF Co-ordinating Committee and attached as Schedule 3 (subject to any changes approved in writing by Noteholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes pursuant to a Majority Noteholder Request Notice, upon request of the Company).

**Noteholder** means a person who is the beneficial owner of and/or the owner of the ultimate economic interest in any of the Notes from time to time, whose interests in the Notes are held through records maintained in book entry form by a Clearing System.

**Noteholder Committee** means the ad-hoc committee of Noteholders initially formed on 2 October 2015 whose members include, as at the date hereof, Argentem Creek Partners LP, Ashmore Investment Management Limited, ICE Canyon LLC, Portland Worldwide Investments Ltd., VR Advisory Services as general partner of VR Global Partners L.P., (in their own capacity or as agents, investment managers, investment advisers, to certain funds and/or managed accounts holding the Notes (as applicable)).

**Notes** means the 2016 Notes, the 2017 Notes and the 2018 Notes.

**Notes Subordination Arrangements** means the deed poll dated 1 April 2016 pursuant to which the lenders under the Shareholder Loans grant turnover subordination in favour of the Trustees in accordance with the terms thereof.

**November Moratorium Fee** means an amount of U.S.$1.25 per U.S.$1,000 principal amount of Notes held by each relevant Noteholder as at 31 October 2016.

**October Moratorium Fee** means an amount of U.S.$1.25 per U.S.$1,000 principal amount of Notes held by each relevant Noteholder as at 30 September 2016.

**Principal Transaction Documents** means the First Principal Transaction Documents, the Second Principal Transaction Documents and the Third Principal Transaction Documents.

**Principal Trust Account** means any English law governed trust account to be established by or on behalf of the Company for the purposes of holding funds for the benefit of the Noteholders as contemplated by Clause 3.4(d).

**Proceeding** means any process, suit, action, legal or other proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, execution, distraint, restraint, forfeiture, re-entry, seizure, lien, enforcement of judgment or enforcement of any security.

**PXF Co-ordinating Committee** means a co-ordinating committee of PXF Lenders initially formed on 12 May 2015 whose members include, as at the date hereof, Deutsche Bank AG, Amsterdam Branch, ING Bank N.V., NATIXIS, UniCredit Bank Austria AG and PJSC Ukrsotsbank.

**PXF Facilities** means:

(a)     a loan facility of up to U.S.$1 billion made available pursuant to a loan agreement originally dated 4 August 2011 (as subsequently amended) and arranged by Deutsche Bank AG, Amsterdam Branch and others;

(b)     a loan facility of up to U.S.$325 million made available pursuant to a loan agreement originally dated 25 May 2012 (as subsequently amended) and arranged by Deutsche Bank AG, Amsterdam Branch;

(c)     a loan facility of up to U.S.$560 million made available pursuant to a loan agreement originally dated 21 November 2012 (as subsequently amended) and arranged by Deutsche Bank AG, Amsterdam Branch; and

(d)     a facility of up to U.S.$300 million made available pursuant to a loan agreement originally dated 13 November 2013 (as subsequently amended) and arranged by Deutsche Bank AG, Amsterdam Branch and others.

**PXF Lenders** means the lenders participating in the PXF Facilities.

**PXF Subordination Arrangements** means the subordination agreement dated 1 April 2016 pursuant to which the lenders under the Shareholder Loans grant turnover subordination in favour of the PXF Lenders in accordance with the terms thereof.

**Record Date** means 5 p.m. (New York time) on 23 June 2016.

**Registrar of Companies** means the Registrar of Companies of England and Wales.

**Released Parties** has the meaning given to that term in the Deed of Waiver and Release.

**Restricted Payment** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Restructuring** means the restructuring of the Company's obligations to its creditors (including the Noteholders and the PXF Lenders) to implement the proposal contained in the Non-Binding Restructuring Heads of Terms.

**Restructuring Scheme Convening Hearing** means a convening hearing for a scheme of arrangement in connection with the Restructuring.

**Scheme** means this scheme of arrangement in respect of the Company under Part 26 of the Companies Act in its present form or with or subject to any modification, addition or condition approved or imposed by the Court or approved in accordance with the terms of this Scheme.

**Scheme Claim** means any claim in respect of any Liability of the Company to any person arising out of an interest in the Notes, arising on or before the Record Date or which may arise after the Record Date as a result of an obligation or Liability of the Company incurred or as a result of an event occurring or an act done on or before the Record Date (including, for the avoidance of doubt, any interest accruing on, or accretions arising in respect of, such claims before or after the Record Date), excluding any Liability of the Company to the Trustees under the Trust Deeds other than in respect of the covenants to repay principal and interest on the Notes pursuant to the Trust Deeds.

9

**Scheme Creditor** means the Common Depositaries, the Trustees (solely in their capacities as the beneficiaries of the covenants to repay principal and pay interest on the Notes pursuant to the Trust Deeds) and the Noteholders as at the Record Date.

**Scheme Effective Date** means the date on which an office copy of the order of the Court sanctioning this Scheme under Section 899 of the Companies Act has been delivered to the Registrar of Companies.

**Scheme Effectiveness Condition** means that the Company has provided a certificate addressed to each of the Trustees confirming that the Company has not made any payments of principal or interest owing under the Shareholder Loans during the period commencing on 28 May 2016 to and including the date on which the Scheme is sanctioned by the Court.

**Scheme Meeting** means the meeting of the Scheme Creditors to vote on this Scheme convened pursuant to an order of the Court (and any adjournment of such meeting).

**Scheme Undertaking** means an undertaking set out in Schedule 1 (*Scheme Undertakings*).

**Scheme Settlement Date** means the date on which the Initial Scheme Consideration is paid by the Company in accordance with Clause 3.3(d).

**Second Principal Transaction Documents** means the documents referred to as such in Part 2 of Schedule 4 (*Principal Transaction Documents*).

**Seller Notes** means the seller notes issued on 30 April 2009 by United Coal Company LLC and Metinvest U.S., Inc. in connection with the acquisition by Metinvest U.S., Inc. of United Coal Company LLC which accrue interest at the rate of 7 per cent. per annum (as amended and restated on 10 January 2015).

**September Moratorium Fee** means an amount of U.S.$0.75 per U.S.$1,000 principal amount of Notes held by each relevant Noteholder as at 31 August 2016.

**Settlement Date** has the meaning given to that term in paragraph 8 of Schedule 1 (*Scheme Undertakings*).

**Shareholder Loans** means the loans under the facility agreement between Rainwell Limited and the Company dated 3 April 2014 and the facility agreement between Eltrano Investments Ltd and the Company dated 3 April 2014.

**Sub-Proxy** has the meaning given to that term in Appendix 1 (*Definitions and Interpretation*) of the Explanatory Statement of which this Scheme forms part.

**Subsidiary** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Surety Agreement** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Termination Date** has the meaning given to that term in Clause 3.4.

**Third Principal Transaction Documents** means the documents referred to as such in Part 3 of Schedule 4 (*Principal Transaction Documents*).

**Trust Deed** has the meaning given to that term in the terms and conditions of the 2016 Notes, the 2017 Notes or the 2018 Notes, as applicable.

**Trustee** means the 2016 Note Trustee, the 2017 Note Trustee and/or the 2018 Note Trustee (as applicable).

**Undeclared Default** means the occurrence of any Event of Default other than a Declared Default.

**Yenakiieve I&SW** means Private Joint Stock Company "Yenakiieve Iron and Steel Works" otherwise known as Private Joint Stock Company Enakievo Metallurgical Works (Ukraine), a company organised and existing under the laws of Ukraine, identification code 00191193, whose registered office is at 54 Ilyich Avenue, Building 4, Mariupol, Donetsk Region, 87504, Ukraine.

1.2    In this Scheme, unless the context otherwise requires or otherwise expressly provides:

(a)    references to Recitals, Clauses, Subclauses and Schedules are references to recitals, clauses, subclauses and schedules of this Scheme;

(b)    references to a person include a reference to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c)    references to a statute, statutory provision or regulatory rule or guidance include references to the same as subsequently modified, amended or re-enacted from time to time;

(d)    references to an agreement, deed or document shall be deemed also to refer to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(e)    the singular includes the plural and *vice versa* and words importing one gender shall include all genders;

(f)    references to "including" shall be construed as references to "including without limitation" and "include", "includes" and "included" shall be construed accordingly;

(g)    headings to Recitals, Clauses, Subclauses and Schedules are for ease of reference only and shall not affect the interpretation of this Scheme;

(h)    references to a period of days shall include Saturdays, Sundays and public holidays and where the date which is the final day of a period of days is not a Business Day, that date will be adjusted so that it is the first following day which is a Business Day;

(i)    references to "Dollar", to "U.S.$ " or to "$" are references to the lawful currency from time to time of the United States of America;

(j)    references to "UAH" are references to the lawful currency from time to time of Ukraine; and

(k)    references to time shall be to London time (Greenwich Mean Time or British Summer Time, as appropriate).

## 2.    RECITALS

### 2.1    The Company

(a)    The Company was incorporated in the Netherlands as a private limited company (*besloten vennootschap met beperkte aansprakelijheid*) with trade register number 24321697 on 21 May 2001.

(b)    As at the date hereof, the authorised share capital of the Company is EUR 94,750 divided into 6,750 A shares; 2,251 B Shares; and 474 C shares of par value EUR 10 each, all of which have been issued and are fully paid up.

### 2.2    Notes Issued by the Company

(a)    The Notes are held under arrangements whereby:

   (i)     the Notes have been constituted by the Trust Deeds with the trustee for each of the series being a Trustee;

   (ii)    the Notes were issued wholly in global registered form, the global notes representing the Notes (the **Global Notes**) being held by the Common Depositaries;

   (iii)   interests in the Notes while represented by the Global Notes are held by the Noteholders under systems designed to facilitate paperless transactions;

   (iv)   the systems designed to facilitate paperless transactions involve interests in the Notes being held by Account Holders; each Account Holder may be holding interests in the Notes on behalf of one or more Noteholders; and

   (v)    in the circumstances set out in the terms and conditions relating to the Notes, Noteholders may exchange their interests in any Note for definitive notes.

(b)    The Notes will remain in global form and will not be exchanged into definitive form under or pursuant to this Scheme. References in this Scheme to Notes being held by a Noteholder shall be treated for all purposes as references to the interest held by the relevant Noteholder in the relevant Global Note.

### 2.3    Scheme Consideration

References in this Scheme to any Initial Scheme Consideration or Additional Scheme Consideration being paid to a person shall be treated for all purposes as references to that person being paid directly or indirectly through one or more intermediaries the relevant Initial Scheme Consideration or Additional Scheme Consideration in accordance with the rules and procedures of the relevant Clearing System.  Except as expressly provided herein in relation to the Principal Trust Account and the Interest Trust Account, any payment obligation of the Company in respect of the Notes pursuant to this Scheme shall be discharged by payment to the relevant paying agent under the Notes, except to the extent that there is a failure in its subsequent payment to the relevant Noteholders in accordance with the conditions of the Notes.

### 2.4    The Purpose of this Scheme

The purpose of this Scheme is to effect a compromise and arrangement between the Company and the Scheme Creditors.

**2.5    The Notes and this Scheme**

(a)    The Scheme Creditors consist of:

      (i)    each of the Common Depositaries as a holder of one or more Global Notes and each of the Trustees solely in its capacity as the beneficiary of the covenant to repay principal and pay interest on the Notes pursuant to the relevant Trust Deed; and

      (ii)    the Noteholders (as at the Record Date) as the beneficial owners of and/or persons with the ultimate economic interest in the Notes.

Insofar as it relates to a Trustee, any reference in this Scheme to the Scheme Creditors authorising, directing or instructing a Trustee (whether on its own or as part of a wider group) will be treated for all purposes as an authorisation, direction or instruction of that Trustee in its capacity as a Scheme Creditor to that Trustee in its capacity as the trustee under the relevant Trust Deed to the extent that it is entitled to do so.

(b)    In relation to voting at the Scheme Meeting:

      (i)    the Trustees have agreed not to vote in respect of the Notes at the Scheme Meeting;

      (ii)    The Bank of New York Mellon, London branch as the common depositary for Clearstream, Luxembourg and Euroclear has confirmed that it has not received, nor has it been requested to solicit, any instructions to vote from Clearstream, Luxembourg and Euroclear in respect of the Notes at the Scheme Meeting;

      (iii)    in accordance with its usual procedures, Cede & Co., in its capacity as nominee of DTC, has agreed to appoint the DTC Participants as its proxies for voting purposes under an omnibus proxy in respect of the principal amount of the Notes shown on its records as being held by the DTC Participants as at the Record Date. The DTC Participants are entitled to vote in respect of the Scheme or appoint sub-proxies to enable their votes and those of Noteholders (as at the Record Date) who hold their Notes through DTC Participants in respect of the Scheme to be cast in respect of their recorded principal amount of Notes; and

      (iv)    Noteholders (as at the Record Date) are entitled to vote at the Scheme Meeting in respect of each of their Notes (or, where applicable, are entitled to instruct their DTC Participant to appoint a sub-proxy to vote at the Scheme Meeting on their behalf). Noteholders have been invited to instruct their Account Holders (or sub-proxy, as applicable) as to how they wish to vote in respect of their Notes.

**3.    THE SCHEME**

**3.1    Application and Effectiveness of this Scheme**

(a)    The compromise and arrangement effected by this Scheme shall apply to all Scheme Claims and bind all Scheme Creditors and their successors and assigns.

(b)    If the Scheme Effectiveness Condition has been satisfied (in the opinion of the Company, acting reasonably), this Scheme shall become effective in accordance with its terms on the Scheme Effective Date and all of the right, title and interest of Scheme Creditors to Scheme Claims shall be subject to the compromises and arrangements set out in this Scheme. An office copy of the order of the Court sanctioning this Scheme under Section 899 of the Companies Act will not be delivered to the Registrar of Companies until the Scheme Effectiveness Condition has been satisfied in accordance with this Clause.

(c)     If the Scheme Settlement Date does not occur on or before the Longstop Date, the terms of and the obligations on the parties under or pursuant to this Scheme shall lapse and the compromise and arrangement provided by this Scheme shall be of no effect.

(d)     If a Termination Date has not occurred on or prior to the payment date for any Additional Scheme Consideration in accordance with Clause 3.3(e) and the relevant Additional Scheme Consideration is not paid on or before the date falling 10 calendar days following the date on which it is due, the terms of and the obligations on the parties under or pursuant to this Scheme shall lapse and the compromise and arrangement set out in this Scheme shall be of no further effect.

**3.2     Occurrence of the Scheme Settlement Date**

(a)     It shall be a condition to the occurrence of the Scheme Settlement Date (and the actions to be taken pursuant to the terms of this Scheme on the Scheme Settlement Date) that the Scheme Effective Date has occurred.

(b)     As soon as reasonably practicable after determining whether the Scheme Settlement Date has occurred, the Company shall give the Scheme Creditors notice by the issue of an announcement through the Clearing Systems and on the Scheme Website at www.lucid-is.com/metinvest.

**3.3     Moratorium in respect of Scheme Claims**

(a)     During the Moratorium Period, subject to the terms of this Scheme each Scheme Creditor agrees not to, and in the case of a Scheme Creditor other than a Trustee agrees not to instruct any Trustee to (or agrees not to vote in favour of a resolution of Noteholders to instruct the Trustee to):

    (i)     institute or continue any step, action or Proceedings (including, without limitation, any step, action or Proceedings referred to in conditions 8(d), 8(e) or 8(g) of the 2016 Notes, conditions 10(d), 10(e) or 10(g) of the 2017 Notes and conditions 10(d), 10(e) or 10(g) of the 2018 Notes or any proceedings under the laws of any relevant jurisdiction which have an analogous effect) against the Company, the Guarantors. Ilyich I&SW or any of their Subsidiaries to enforce the terms of any Trust Deed, any Surety Agreement, any Ilyich Notes Suretyship, any Guarantees or any of the Notes; or

    (ii)     give written notice to the Company that any of the Notes are immediately due and payable or demand payment of any principal amounts under the Notes or any amount of interest which is not payable in accordance with the Scheme; or

    (iii)     make a demand under the terms of any Guarantee, any Surety Agreement or under any Ilyich Notes Suretyship.

(b)     Each Scheme Creditor agrees that:

    (i)     any action (including any notice, request or direction made or given) taken in breach of Clause 3.3(a) shall be void and of no effect;

    (ii)     damages for breach of Clause 3.3(a) would be an inadequate remedy and consents to the Company seeking specific performance and/or injunctive relief to restrain any such breach; and

    (iii)     it waives any requirement on the Company to provide a cross-undertaking in damages in respect of any injunctive relief which the Company seeks to restrain a breach of Clause 3.3(a);

(c)     Each Scheme Creditor agrees that any amount of unpaid capitalised interest (together with interest accrued thereon) that accrued pursuant to the First Moratorium Scheme (the **First Moratorium Scheme Capitalised Interest**) shall not be due and payable until the Termination Date or if a Restructuring is implemented and becomes effective, shall be included in the principal amount of the new notes to be issued thereunder and shall be payable on the dates and in the manner set out in the definitive documentation in relation to such Restructuring.

(d)     In consideration of the agreement by the Scheme Creditors referred to in Clauses 3.3(a), 3.3(b) and 3.3(c), the Company:

  (i)     shall as soon as practicable following the occurrence of the Scheme Effective Date pay the Initial Scheme Consideration and each Scheme Creditor shall be entitled to receive its share of the Initial Scheme Consideration, in each case in accordance with and subject to the terms of this Scheme;

  (ii)     agrees that any amount of accrued but unpaid interest (which accrues from day to day) to and including the Termination Date to the extent unpaid shall be capitalised and added to the principal amount of the relevant Notes on the relevant Determination Date and, accordingly, shall bear interest in accordance with the terms and conditions of such Notes, and, further, that the aggregate amount of such capitalised interest (together with interest accrued thereon) together with the First Moratorium Scheme Capitalised Interest (without double counting) shall be due and payable on the Termination Date or, if a Restructuring is implemented and becomes effective, shall be included in the principal amount of the new notes to be issued thereunder and shall be payable on the dates and in the manner set out in the definitive documentation in relation to such Restructuring; and

  (iii)     agrees, during the Moratorium Period (and, in relation to the payment of interest pursuant to paragraphs 4 and 5 of Schedule 1 (*Scheme Undertakings*) in respect of a Determination Date occurring on the Termination Date to the extent such Termination Date occurred pursuant to Clause 3.4(a) until and including the relevant Settlement Date for such payment), to comply with the Scheme Undertakings.

(e)     Subject to sub-clause (f) below, if a Termination Date has not occurred on or prior to:

  (i)     31 July 2016 and no Early Termination Notice has been served and become effective in accordance with Clause 3.6 on or before that date, the Company shall pay the August Moratorium Fee on 8 August 2016 and each Noteholder as at 5p.m. (New York time) on 29 July 2016 shall be entitled to receive its share of the August Moratorium Fee, in each case in accordance with and subject to the terms of this Scheme;

  (ii)     31 August 2016, the Company shall pay the September Moratorium Fee on 8 September 2016 and each Noteholder as at 5p.m. (New York time) on 31 August 2016 shall be entitled to receive its share of the September Moratorium Fee, in each case in accordance with and subject to the terms of this Scheme;

  (iii)     30 September 2016, the Company shall pay the October Moratorium Fee on 7 October 2016 and each Noteholder as at 5p.m. (New York time) on 30 September 2016 shall be entitled to receive its share of the October Moratorium Fee, in each case in accordance with and subject to the terms of this Scheme; and

  (iv)     31 October 2016, the Company shall pay the November Moratorium Fee on 7 November 2016 and each Noteholder as at 5p.m. (New York time) on 31 October 2016 shall be entitled to receive its share of the November Moratorium Fee, in each case in accordance with and subject to the terms of this Scheme.

(f)  Additional Scheme Consideration shall not be payable if on the relevant payment date the Restructuring has been implemented and is effective and/or a Termination Date has occurred.

(g)  Payment to the Principal Trust Account of any amount required by Clause 3.4(d) will discharge the relevant payment obligations of the Company under that paragraph. The aggregate amount credited to the Principal Trust Account (together with any interest accrued thereon but net of any fees and charges) will be distributed to the Noteholders rateably in accordance with the principal amount of the holdings of their Notes as at the Termination Date as soon as practicable following the occurrence of the Termination Date.

## 3.4   Termination Date

Except as expressly provided otherwise, the compromise and arrangement provided by this Scheme will terminate and cease to have further effect on the earliest of:

(a)  30 September 2016 subject to:

　　(i)   extension in accordance with Clause 3.5; and

　　(ii)  early termination in accordance with Clause 3.6,

in which case the reference to 30 September 2016 above shall be replaced with the relevant date determined in accordance with those paragraphs;

(b)  the date of the occurrence of an Undeclared Default;

(c)  the date of the occurrence of a breach of a Scheme Undertaking which is not remedied within the period, if any, specified in Schedule 1 (*Scheme Undertakings*);

(d)  the date which is 10 days after the date on which any principal amount of the PXF Facilities is paid to the PXF Lenders (except as result of it becoming unlawful for any amount to remain outstanding to a PXF Lender) during the period commencing on the Scheme Effective Date to and including 30 November 2016 if, on or prior to the first mentioned date, the Company has not deposited in a Principal Trust Account an amount equal to such principal amount to be held on trust for the Noteholders in accordance with Clause 3.3(g); and

(e)  the date on which the Company announces a restructuring proposal for the Notes that is not consistent with the Non-Binding Restructuring Heads of Terms,

(the **Termination Date**).

## 3.5   Extensions to the Scheme

(a)  Subject to Clause 3.6 and Clause 3.4(b), (c), (d) and (e), the Termination Date specified in Clause 3.4(a) will be extended from 30 September 2016 to:

　　(i)   31 October 2016 if:

　　　　(A)  a Restructuring Scheme Convening Hearing has occurred on or before 30 September 2016; or

　　　　(B)  the advisers to the Noteholder Committee and the PXF Co-ordinating Committee, acting reasonably and in good faith, have not jointly provided

the Company with the drafts of the Principal Transaction Documents by 31 August 2016; and/or

(ii)      30 November 2016, if an Extension Notice has been delivered to the Company in accordance with Clause 3.5(b).

(b)      Noteholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes may deliver to the Company a Majority Noteholder Request Notice specifying that the compromise and arrangement under this Scheme shall be extended (the **Extension Notice**), in which case the Termination Date specified in Clause 3.4(a) shall be extended to 30 November 2016. An Extension Notice may be delivered at any time at which the compromise and arrangement under this Scheme is in effect including, for the avoidance of doubt, where a Restructuring Scheme Convening Hearing has occurred:

(i)      prior to 31 July 2016 but the implementation of the Restructuring has not occurred, or is not likely to occur, on or prior to 31 August 2016; and

(ii)      between 31 July 2016 and 30 September 2016 but the implementation of the Restructuring has not occurred, or is not likely to occur, on or prior to 31 October 2016.

### 3.6   Early Termination of the Scheme

Noteholders holding at least 50.01% of the aggregate outstanding principal amount of the Notes may deliver to the Company a Majority Noteholder Request Notice between 15 July 2016 and 31 July 2016, inclusive, specifying that the compromise and arrangement under this Scheme shall terminate in accordance with this Clause 3.6 (the **Early Termination Notice**), in which case the Termination Date specified in Clause 3.4(a) shall occur on the later of:

(a)      31 July 2016; and

(b)      the date falling 10 Business Days after receipt by the Company of the Early Termination Date Notice,

(the **Early Termination Date**) provided that the Early Termination Notice will have no effect if:

(i)      a Restructuring Scheme Convening Hearing has occurred prior to 31 July 2016 (in which case, subject to Clause 3.5(b), the Termination Date specified in Clause 3.4(a) shall occur on 31 August 2016); and/or

(ii)      the advisers to the Noteholder Committee and the PXF Co-ordinating Committee, acting reasonably and in good faith, have not jointly provided the Company with the drafts of the First Principal Transaction Documents by 30 June 2016, the Second Principal Transaction Documents by 15 July 2016 and the Third Principal Transaction Documents by 31 July 2016.

### 3.7   Instructions, Authorisations and Directions

(a)      On the Scheme Effective Date, in consideration of the rights of the Scheme Creditors under this Scheme and notwithstanding any term of any relevant document, the Scheme Creditors:

(i)      hereby irrevocably direct each of the Trustees to execute and do, and to instruct any other person which it is entitled to instruct to execute and do, or otherwise procure to be executed

and done, all documents, acts or things as may be necessary or desirable to be executed or done by it or such other person for the purposes of giving effect to the terms of this Scheme;

(ii)     hereby irrevocably authorise the Company to execute and do, and to instruct any other person which it is entitled to instruct to execute and do, or otherwise procure to be executed and done, all documents, acts or things as may be necessary or desirable to be executed or done by it or such other person for the purposes of giving effect to the terms of this Scheme; and

(iii)    hereby request and to the extent they are entitled to do so instruct the Company to perform each of its obligations arising under this Scheme.

(b)     The directions, instructions and authorisations granted under Clause 3.7(a) shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

### 3.8     Grant of Authority

Each of the Scheme Creditors hereby irrevocably authorises the Company on and from the Scheme Effective Date to enter into, execute and deliver as a deed (or otherwise) on behalf of that Scheme Creditor in its capacity as a Scheme Creditor (including any person to whom a Scheme Creditor has transferred its rights in respect of its Scheme Claim after the Record Date) (to the extent applicable):

(a)     any document in connection with the actions described in Clause 3.3;

(b)     the Deed of Waiver and Release; and

(c)     any and all other documents that the Company reasonably considers necessary or desirable to give effect to the terms of this Scheme,

for the purposes of giving effect to the terms of this Scheme. The authority granted under this Clause 3.8 shall be treated, for all purposes whatsoever and without limitation, as having been granted by deed.

### 3.9     Implementation of Arrangements

(a)     If the Company reasonably considers it necessary or desirable to execute any document or documents to give effect to the terms of this Scheme on behalf of any of the Scheme Creditors on any day from (and including) the Scheme Effective Date to and (including) the expiry of the Moratorium Period, the Company shall execute such document or documents on behalf of the relevant Scheme Creditor pursuant to the authority granted under Clause 3.8.

(b)     On the Scheme Effective Date, the Company:

(i)      for itself and/or on behalf of each relevant Scheme Creditor pursuant to the authority granted under Clause 3.8 shall issue the directions described in Clause 3.7(a) and execute any document in connection with the actions described in Clause 3.3; and

(ii)     shall execute the Deed of Waiver and Release on behalf of each Scheme Creditor pursuant to the authority granted under Clause 3.8.

(c)     On the Scheme Settlement Date, the Company shall pay the Initial Scheme Consideration in accordance with Clause 3.3(d).

(d)     The payment of the Initial Scheme Consideration, the payment of the Additional Scheme Consideration, if and to the extent applicable, and the performance of its other obligations under this Scheme will discharge the Company's obligation to the Scheme Creditors under this Scheme.

(e)     On and from the Scheme Effective Date (but subject to the other provisions of this Scheme) each Scheme Creditor shall be entitled to the rights and benefits accruing to that Scheme Creditor under this Scheme and all of the existing rights and benefits of the Scheme Creditors in respect of the Scheme Claims shall be subject and limited to the compromise and arrangement provided by this Scheme.

(f)     Except as varied by the compromise and arrangement effected by this Scheme, the rights of all Scheme Creditors in respect of the Notes shall remain in full force and effect.

**3.10    Record Date**

All Scheme Claims shall be determined as at the Record Date.

**3.11    Assignments or Transfers**

The Company shall be under no obligation to recognise any assignment or transfer of Scheme Claims after the Record Date for the purposes of determining entitlements under this Scheme, provided that the Company may, in its sole discretion and subject to the production of such other evidence as it may require and to any other terms and conditions which it may render necessary or desirable, recognise such assignment or transfer for the purposes of determining entitlements under this Scheme. It shall be a term of such recognition that the assignee or transferee of a Scheme Claim so recognised by the Company shall be bound by the terms of this Scheme and for the purposes of this Scheme shall be a Scheme Creditor.

**3.12    Costs**

(a)     The Company shall pay, or procure the payment of, in full all costs, charges, expenses and disbursements incurred by it in connection with the negotiation, preparation and implementation of this Scheme as and when they arise, including, but not limited to, the costs of holding the Scheme Meeting, the costs of obtaining the sanction of the Court and the costs of placing the notices (if any) required by this Scheme.

(b)     The Company shall pay, or procure the payment of, in full the costs, charges, expenses and disbursements reasonably incurred by the Common Depositaries and the Trustees in connection with the negotiation, preparation and implementation of this Scheme.

**3.13    Modifications**

The Company may, at any hearing of the Court to sanction this Scheme, consent on behalf of all Scheme Creditors to any modification of this Scheme or any terms or conditions which the Court may think fit to approve or impose and which would not directly or indirectly have a material adverse effect on the interests of any Scheme Creditor under this Scheme.

**3.14    Obligations on dates other than a Business Day**

If any sum is due or obligation is to be performed under the terms of this Scheme on a day other than a Business Day, the relevant payment shall be made, or obligation performed on the next Business Day.

**3.15    Notices**

(a)    Any notice or other written communication to be given under or in relation to this Scheme (including any service of process in connection with a breach of Clause 3.3(a)) (other than any Account Holder Letter or Sub-Proxy, which are to be delivered in accordance with the instructions contained therein) shall be given in writing and shall be deemed to have been duly given if it is delivered by hand, pre-paid first class post, airmail, fax or electronically to:

    (i)    in the case of the Company:

        Metinvest B.V.
        Nassaulaan 2A
        2514JS 's-Gravenhage
        Netherlands

        Telephone:        +31 70 36 40 900
        Fax:               +31 70 36 35 795
        Attention of:     Mr Ryzhenkov / Mr Lyubarev

    (ii)    in the case of a Noteholder, either:

        (A)    its last known address, fax number or email address according to the Company; or

        (B)    to the relevant Trustee for and on behalf of that Noteholder, at/on the contact details set out at Subclause (iv) below.

    (iii)    in the case of the Common Depositaries:

        Cede & Co.
        55 Water Street
        New York, NY 10041
        United States

        and

        The Bank of New York Mellon
        One Canada Square
        London E14 5AL
        Fax:               +44 207 964 4637
        Copy to Fax:    +44 1202 689660
        Attention:      Corporate Trust Administration (Metinvest)
        Email:           CORPSOV2@bnymellon.com

    (iv)    in the case of the 2016 Note Trustee:

        BNY Mellon Corporate Trustee Services Limited
        One Canada Square
        London E14 5AL
        United Kingdom
        Fax:   +44 20 7964 2536
        Attention: Trustee Administration Manager (Metinvest B.V.)

        and in case of the 2017 Note Trustee or the 2018 Note Trustee:

GLAS Trust Corporation Limited
45 Ludgate Hill
London EC4M 7JU
United Kingdom
Tel: +44 (0)20 3597 2940
Fax: +44 (0)20 3070 0113
Attention: Transaction Management Team

(v)    in the case of the Information Agent:

Lucid Issuer Services Limited
Tankerton Works
12 Argyle Walk
London WC1H 8HA
Email:           metinvest@lucid-is.com
Phone:         +44 (0)20 7704 0880
Fax:              +44 (0)20 3004 1590
Attention of:    Sunjeeve Patel / Thomas Choquet

(vi)    in the case of any other person, any address, fax number or email address set forth for that person in any agreement entered into in connection with this Scheme or the last known address, fax number or email address according to the Company.

(b)    Any notice or other written communication to be given under or in relation to this Scheme (other than any Account Holder Letter or Sub-Proxy, which are to be delivered in accordance with the instructions contained therein) shall be deemed to have been delivered and served:

(i)    if delivered by hand, when actually received provided that, if such receipt occurs after 5.00 p.m. in the place of receipt, the following Business Day;

(ii)    if sent by pre-paid first class post or airmail, on the second Business Day after posting if the recipient is in the country of dispatch, otherwise the seventh Business Day after posting;

(iii)    if sent electronically or by fax, when actually received in readable form provided that, if such receipt in readable form occurs after 5.00 p.m. in the place of receipt, the following Business Day; and

(iv)    if by advertisement or Irish Stock Exchange announcement, on the date of publication.

(c)    In proving service, it shall be sufficient proof, in the case of a notice sent by pre-paid first class post or airmail, that the envelope was properly stamped, addressed and placed in the post.

(d)    The accidental omission to send any notice, written communication or other document in accordance with Clauses 3.15(a) to 3.15(b), or the non-receipt of any such notice by any Scheme Creditor, shall not affect the provisions of this Scheme.

(e)    Notwithstanding any provision to the contrary contained in this Scheme:

(i)    while the Notes are represented by Global Notes and deposited with the Common Depositaries for the Clearing Systems, notice to the Noteholders may be given instead by delivery of the notice to the Clearing Systems and such notices shall be deemed to have been given to the Noteholders on the date of delivery to the Clearing Systems;

(ii)     a Trustee may approve some other method of giving notice to the Noteholders of the relevant Notes if, in its opinion, that other method is reasonable having regard to market practice then prevailing and to the requirements of any stock exchange on which the relevant Notes are then listed and provided that notice of that other method is given to the Noteholders in the manner required by that Trustee; and

(iii)    a copy of each notice given in accordance with this Clause shall be provided to the Irish Stock Exchange for so long as the Notes are listed on the Irish Stock Exchange and the relevant regulations so require.

### 3.16    Governing Law and Jurisdiction

(a)      The operative terms of this Scheme and any non-contractual obligations arising out of or in connection with this Scheme shall be governed by and construed in accordance with the laws of England and Wales. The Scheme Creditors hereby agree that the Court shall have exclusive jurisdiction to hear and determine any suit, action or Proceeding and to settle any dispute which arises out of or in connection with the terms of this Scheme or its implementation or out of any action taken or omitted to be taken under this Scheme or in connection with the administration of this Scheme and for such purposes the Scheme Creditors irrevocably submit to the jurisdiction of the Court, provided, however, that nothing in this Clause shall affect the validity of other provisions determining governing law and jurisdiction as between the Company and any of the Scheme Creditors, whether contained in contract or otherwise.

(b)      The terms of this Scheme and the obligations imposed on the Company hereunder shall take effect subject to any prohibition or condition imposed by applicable law.

Dated this 30th day of June 2016

22

## SCHEDULE 1

### SCHEME UNDERTAKINGS

1.   The Company will procure that members of the Group will not make any payments in respect of capital expenditure in any calendar month in an aggregate amount greater than U.S.\$70,000,000 (the **Monthly Capex Amount**) (provided that any part of any unspent Monthly Capex Amount may be carried forward and added to any future Monthly Capex Amount until utilised and provided further that the aggregate amount of capital expenditure for 2016 shall not exceed the amount that would be permitted under the Non-Binding Restructuring Heads of Terms).

2.   The Company will provide a monthly report, in a form agreed with the legal and financial advisers to the Noteholder Committee (a **Monthly Report**), within 60 days of the last day of the calendar month (the **Delivery Date**) to which the Monthly Report relates, commencing with the report for May 2016. A Monthly Report, in the form so agreed, shall also be delivered in respect of the month of April 2016 and shall be published on the Company's website on or prior to the date falling 5 calendar days after the Scheme Effective Date. The Company shall not be in breach of this undertaking if it has provided the relevant Monthly Report within 5 calendar days following the applicable Delivery Date.

3.   The Company will not make, and will not permit any Subsidiary to make, any Restricted Payment or any payment of principal owing in respect of any Shareholder Loans.

4.   Subject to paragraph 8 below, the Company will pay to the Noteholders and the PXF Lenders (as applicable) an amount equal to 30% of accrued and unpaid interest (whether or not then due and payable under the relevant terms and conditions of the Notes or the terms of the PXF Facilities) under the Notes and the PXF Facilities from and including 27 May 2016 up to but excluding the first Determination Date, and subsequently from the most recent Determination Date to but excluding the next Determination Date (such amounts being **Cash Pay Interest Amounts**). **Determination Date** shall mean each of the following:

   (a)   30 June 2016;

   (b)   31 July 2016 or, if an Early Termination Notice has been delivered on or prior to 31 July 2016 and is effective, the Early Termination Date;

   (c)   31 August 2016;

   (d)   30 September 2016;

   (e)   31 October 2016; and

   (f)   30 November 2016,

         provided that neither (i) a Termination Date or (ii) the implementation of the Restructuring, has occurred prior to the relevant Determination Date.

5.   In addition to the Cash Pay Interest Amounts and subject to paragraph 8 below, the Company will pay an amount equal to the difference (if positive) between (x) the average of unrestricted cash balances (as determined in good faith by the Company) as of the close of business on Friday of each of the four weeks immediately preceding the relevant Determination Date and (y) U.S.\$180,000,000, in respect of interest (other than Cash Pay Interest Amounts) accrued and unpaid under the Notes and the PXF Facilities (whether or not then due) up to but excluding the relevant Determination

Date. Such amount shall be allocated and paid pro rata to the amounts of interest (other than Cash Pay Interest Amounts) accrued and unpaid (whether or not then due) under the Notes and the PXF Facilities (subject to rounding).

6.  The Company will not make any payment in respect of interest owing under any of the PXF Facilities in amounts additional to those contemplated under paragraphs 4 and 5 above, unless any such additional payment is made in respect of the Notes and the PXF Facilities pro rata to the amounts of interest then accrued and unpaid under the Notes and the PXF Facilities and on the Settlement Dates.

7.  The Company will not make any payment in respect of interest owing under the Shareholder Loans.

8.  The interest payable pursuant to paragraphs 4 and 5 above shall be due and payable on the date falling 5 Business Days following the Friday immediately prior to the occurrence of each Determination Date (the **Settlement Date**), provided that:

    (a)  no Termination Date under Clause 3.4(c) shall occur by reason of any breach by the Company of its obligations under paragraphs 4 and 5 above if the Company remedies such breach of its obligations within 10 calendar days of the relevant Settlement Date; and

    (b)  if the relevant paying agents under the Notes (the **Paying Agents**) refuse or are unable to process all or part of the payments of due and/or accrued interest under the Notes referred to in paragraphs 4 and 5 above (such unpaid amount being the **Relevant Interest Amount**) as contemplated above, the Company will deposit in an English law governed trust account (the **Interest Trust Account**) an amount equal to the Relevant Interest Amount to be held on trust for the Noteholders within 10 calendar days of the relevant Settlement Date. Payment of the Relevant Interest Amount to the Interest Trust Account will discharge the payment obligations of the Company under paragraphs 4 and 5 above in respect of the Relevant Interest Amount. The aggregate amount credited to the Interest Trust Account (net of any fees and charges) will be distributed to the applicable Noteholders in accordance with their entitlements under paragraphs 4 and 5 above as soon as practicable following the earlier of (i) the date the Paying Agents confirm to the Company that they will process the applicable Relevant Interest Amount and (ii) the Termination Date; and

    (c)  during the Moratorium Period, interest payments under the Notes shall be due solely on the relevant Settlement Dates and no interest shall be payable under the Notes on any other dates specified in the relevant terms and conditions of the Notes.

    For the purposes of calculating the interest payable pursuant to paragraphs 4 and 5 above, the relevant record date in respect of a Determination Date shall be determined in accordance with the terms and conditions of the Notes.

9.  The Company will:

    (a)  on or before the Scheme Effective Date, procure that the lenders under the Shareholder Loans enter into an arrangement the effect of which will extend the turnover subordination under the Notes Subordination Arrangements, such arrangement only to become effective on the date that, and on substantially similar terms to, any arrangement the effect of which extends the turnover subordination under the PXF Subordination Arrangements (the **New PXF Subordination Arrangements**) until the Termination Date (or until such other date specified in any such arrangement) becomes effective; and

    (b)  not and will procure that no member of the Group will, during the Moratorium Period, enter into any suretyship, grant any security or provide other credit support or credit enhancement

in favour of the PXF Lenders (in their capacities as lenders under the PXF Facilities) (excluding any replacement of any existing suretyship, security, other credit support or credit enhancement and any new suretyship, security, other credit support or credit enhancement, which will be provided solely for the benefit of the PXF Lenders pursuant to the implementation of the Restructuring) unless it (or the relevant member of the Group) enters into, grants or provides the same suretyship, security or other credit support or credit enhancement (as applicable),

in each case in favour of the 2016 Note Trustee, the 2017 Note Trustee and the 2018 Note Trustee such that the Noteholders and the PXF Lenders share the benefit of the subordination of the Shareholder Loans or suretyship, security or other credit support or credit enhancement, as the case may be, pro rata in respect of the aggregate principal amount outstanding under the Notes and the PXF Facilities, calculated as at 27 May 2016.

**SCHEDULE 2**

**FORM OF DEED OF WAIVER AND RELEASE**

# DEED OF WAIVER AND RELEASE

**DATED [●] 2016**

by

**THE SCHEME CREDITORS**

in favour of

**THE RELEASED PARTIES**

## **CONTENTS**

**Clause**                                                                                                                **Page**

1.    Interpretation .......................................................................................................................................28
2.    Waiver and Release ..............................................................................................................................29
3.    Further Assurances ...............................................................................................................................29
4.    Contracts (Rights of Third Parties) Act..............................................................................................29
5.    Counterparts .........................................................................................................................................29
6.    Governing Law and Jurisdiction .........................................................................................................30

## **Appendix**

1.    Released Parties....................................................................................................................................31
      Part 1    Transaction Released Parties ........................................................................................31
      Part 2    Adviser Released Parties...............................................................................................32

**THIS DEED** is dated [●] 2016 and is made by:

(1)     **THE SCHEME CREDITORS** (as defined below), acting by an authorised officer of Metinvest B.V. (the **Company**) pursuant to the authority conferred upon the Company by the Scheme Creditors under Clause 3.8 of the Scheme (as defined below),

In favour of:

(2)     **THE RELEASED PARTIES** (as defined below).

**BACKGROUND**

(A)     The Company has entered into the Scheme with the Scheme Creditors.

(B)     The Company is authorised, under Clause 3.8 of the Scheme, to execute and deliver this Deed on behalf of each of the Scheme Creditors.

(C)     It is intended that this document takes effect as a deed notwithstanding the fact that a party may only execute this document under hand.

**IT IS AGREED** as follows:

**1.     INTERPRETATION**

**1.1     Definitions**

In this Deed:

**Adviser Released Party** means the persons listed at Part 2 of Appendix 1 of this Deed.

**Released Parties** means the Adviser Released Parties and the Transaction Released Parties.

**Scheme** means the scheme of arrangement pursuant to Part 26 of the Companies Act 2006 between the Company and the Scheme Creditors as sanctioned by the Court on or about the date of this Deed.

**Scheme Creditor** means the Common Depositaries, the Trustees (solely in their capacities as the beneficiaries of the covenants to repay principal and interest on the Notes pursuant to the Trust Deeds) and the Noteholders.

**Transaction Released Parties** means the persons listed at Part 1 of Appendix 1 of this Deed.

**1.2     Construction**

(a)     Capitalised terms defined in the Scheme have, unless expressly defined in this Deed, the same meaning in this Deed.

(b)     In this Deed, unless the context otherwise requires or otherwise expressly provides:

(i)      references to Clauses are references to Clauses of this Deed;

(ii)     references to a person include references to an individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

28

(iii)     references to a statute or statutory provision include references to the same as subsequently modified, amended or re-enacted from time to time;

(iv)     the singular includes the plural and vice versa and words importing one gender shall include all genders; and

(v)     headings to Clauses are for ease of reference only and shall not affect the interpretation of this Deed.

## 2.    WAIVER AND RELEASE

2.1    With effect from the Scheme Effective Date and without prejudice to the provisions of the Scheme, the Scheme Creditors (on their own behalf and on behalf of any person to whom they may have transferred their Scheme Claims after the Record Date) hereby irrevocably and unconditionally:

(a)     waive, release and discharge fully and absolutely all Liabilities of the Released Parties to the Scheme Creditors in relation to or in connection with or in any way arising out of the preparation, negotiation or implementation of the Scheme; and

(b)     waive each and every claim which the Scheme Creditors (or any person to whom a Scheme Creditor may have transferred its Scheme Claim after the Record Date) may have in relation to or in connection with or in any way arising out of the preparation, negotiation or implementation of the Scheme against the Released Parties.

2.2    Each release, waiver and discharge effected by the terms of Clause 2.1 above shall not extend to:

(a)     any Liability of any Adviser Released Party arising under or relating to a duty of care to such Adviser Released Party's client or arising under a duty of care to another person which has been expressly accepted or acknowledged in writing by that Adviser Released Party; and

(b)     any Liability arising out of or resulting from gross negligence, wilful default or fraud (or any claim relating to such Liability).

## 3.    FURTHER ASSURANCES

The Scheme Creditors will take whatever action is reasonably necessary to achieve the waiver, release and discharge referred to in Clause 2 (Waiver and Release).

## 4.    CONTRACTS (RIGHTS OF THIRD PARTIES) ACT

4.1    Other than as provided in Clause 4.2 below, a person who is not party to this Deed has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of this Deed.

4.2    A Released Party may rely on and enforce the terms of this Deed.

## 5.    COUNTERPARTS

This Deed may be executed in any number of counterparts. This has the same effect as if the signatures on the counterparts were on a single copy of the Deed.

6.    GOVERNING LAW AND JURISDICTION

This Deed and any non-contractual obligations arising out of or in connection with it are governed by English law. The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Deed or any non-contractual obligations connected with it.

This Deed has been entered into and delivered as a deed on the date stated at the beginning of this Deed.

**APPENDIX 1**

**RELEASED PARTIES**

**PART 1**

**TRANSACTION RELEASED PARTIES**

1.    The Company and its directors, members and representatives.

2.    BNY Mellon Corporate Trustee Services Limited in its capacity as trustee for the 2016 Notes.

3.    GLAS Trust Corporation Limited in its capacity as trustee for the 2017 Notes and the 2018 Notes.

4.    The Bank of New York Mellon in its capacity as paying agent for each series of the Notes.

5.    Each Common Depositary.

6.    Each member of the Noteholder Committee named in the definition of Noteholder Committee in Clause 1.1 of the Scheme.

# PART 2

## ADVISER RELEASED PARTIES

1.    Rothschild & Cie.

2.    Allen & Overy LLP.

3.    Baker & McKenzie LLP and all other member firms of Baker & McKenzie International, a Swiss Verein.

4.    Deloitte LLP.

5.    Linklaters LLP.

6.    PJT Partners (UK) Limited.

7.    Hogan Lovells International LLP.

**SIGNATORIES**

**SCHEME CREDITORS**

| EXECUTED AND DELIVERED AS A DEED by **METINVEST B.V.** | ) ) ) |
|---|---|
| acting pursuant to the authority conferred on Metinvest B.V. for this purpose under the Scheme | ) ) |

acting by

Authorised Signatory

in the presence of

**SCHEDULE 3**

**NON-BINDING RESTRUCTURING HEADS OF TERMS**

**NON-BINDING RESTRUCTURING HEADS OF TERMS
METINVEST**

*This does not constitute an offer to sell or the solicitation of an offer to buy securities of
Metinvest B.V. or any other person.*

**KEY TERMS:**

1. **Note Maturity:**      Existing US$85.5m 10.25% 2016 Notes, US$289.6m 10.50% 2017 Notes
and US$750m 2018 Notes to be re-profiled at par into a new single
US$1,125.1m Note, with a final maturity of 31 December 2021 (the
"**Notes**").

2. **Note Amortisation:**   Via cash sweep (see "Cash Sweep / Waterfall" section for greater detail)
and a payment of residual balances at final maturity.

3. **Note Coupon:**        Payable quarterly from restructuring close until 31 December 2018
("**Period 1**"), as follows:

   (a)    A minimum of 2.793% p.a. is to be paid in cash in all
circumstances

   (b)  Pay-if-you-can ("**PIYC**") of up to 6.5795% p.a. payable through the
cash sweep (and, to the extent not paid in cash, added to the
principal amount of the Notes)

   (c)    Any previously PIK-ed interest accrued during Period 1, payable
through the cash sweep

   (d)    "Catch-up" interest equal to 1.5025% p.a., payable through cash
sweep (which amount, if not paid with respect to the relevant
quarter, will not be added to the principal amount of the Notes and
will not be deemed to be accrued and unpaid interest due)

   (e)    See "Cash Sweep / Waterfall" section for additional detail

   From 1 January 2019 onwards ("**Period 2**"), full cash pay of the New
Note Coupon in all circumstances.

   The "**New Note Coupon**" shall be 10.875%.

   MFN clause (including pricing) to regulate relationship between the Notes
and the PXF Facility going forward.

4. **PXF Maturities /
Amortisation**           Existing PXF facilities of US$1,070.7m to be re-profiled at par into a single
US$1,070.7m Facility, with a final maturity of 30 June 2021 (the "**PXF
Facility**").
During Period 1 the PXF Facility may receive quarterly principal repayments
through the Waterfall mechanism equal to the difference between the New Note
Coupon and the all-in coupon of L+4.16% p.a. (Libor floor at 1.00%)
("**Normalisation Payments**"), and additional payments received via Waterfall

mechanism (see Cash Sweep / Waterfall).
During Period 2 the PXF will receive fixed quarterly principal repayments of the difference between the Notes and the PXF's interest payments in that period (i.e. the New Note Coupon minus L+4.16% p.a.(Libor floor at 1.00%)), plus fixed principal amortisation in relation to the balance of unpaid PXF PIKed interest at end of Period 1, plus minimum quarterly PXF amortization (amounts as per Annexe 1). It is understood that all will be preserving a WAL difference of approximately 1.25 years between the current PXF and Notes on a contractual basis.
Additional payments received via Waterfall mechanism (see "Cash Sweep / Waterfall"), and a payment of any residual balance at maturity.

**5. PXF Margin Terms** / For Period 1, L+4.16% p.a. (Libor floor at 1.00%), i.e. minimum 5.16% p.a. all in, of which:

(a) A minimum of 30% is to be paid in cash in all circumstances, payable monthly

(b) PIYC of up to 70% of remaining interest, payable through cash sweep (and, to the extent not paid in cash, added to the principal amount of the PXF Facility)

(c) Any previously PIK-ed interest accrued during Period 1, payable through the cash sweep

(d) See "Cash Sweep / Waterfall" section for additional detail

During Period 2, full cash pay of L+4.16% p.a. (Libor floor at 1.00%) in all circumstances.

MFN clause (including pricing) to regulate relationship between Notes and PXF going forward.

**6. Cash Sweep Waterfall** / Quarterly cash sweep for Notes and PXF above a minimum cash balance (excluding cash in UCC) of $180m (based on average unrestricted cash balances (and, to the extent that restricted cash balances exceed $75m, restricted cash balances) and cash equivalents and subject to independent monitoring and verification to be agreed). If Metinvest identifies any capex project in relation to which it wishes to allocate cash on a restricted basis then any such allocation (and resulting increase of restricted cash balances for the purpose of the cash sweep) shall be subject to consent from the requisite majority under the PXF Facility (provided that any fees paid to the PXF Lenders in connection with such consent shall be also paid to the Noteholders on a pro rata basis).

Waterfall as follows:

| **Contractual** | Prior to 31 Dec 2018 (Period 1) | From 1 January 2019 (Period 2) |
|---|---|---|
| | Approx. 30% cash-pay of coupon/ | 100% cash-pay of coupon/interest (the New Note Coupon / L+4.16% |

| | | |
|---|---|---|
| | 30% cash-pay of interest | p.a. (Libor floor at 1.00%) for Notes / PXF Facility respectively); plus |
| | | PXF amortization as detailed in paragraph 4 above. |
| **If cash is available above the notional floor** | Level 1: Remaining approx. 70% of the coupon/70% of interest balance in that period, pro rata, based on outstanding interest amounts due and payable in that period; then | Level 1: Cash sweep for Notes and PXF pro rata based on debt balances outstanding (excluding PIKed balances) |
| | Level 2: Any approx. 70% coupon/70% of interest from prior periods pro rata, based on total outstanding accrued interest amounts; then | |
| | Level 3: Notes: "Catch-up" interest equal to 1.5025%) as interest; PXF: max (the New Note Coupon less L+4.16 with Libor floor at 1%) amortization, pro rata (based on outstanding amounts accrued in that period); then | |
| | Level 4: Principal balances pro-rata on the debt balances outstanding | |

7. **Prepayments of Notes and PXF Facility**

Prepayments/redemption permitted without consent and penalties at par provided that made and applied in accordance with the "Cash Sweep / Waterfall" section. Bond buy-backs not permitted, except at par and provided PXF is also repaid at the same time and in accordance with the "Cash Sweep / Waterfall" section. Customary mandatory prepayment provisions to be agreed and included in final documentation.

8. **Other Cash Sweep Conditions**

During Period 1:

Capex to be capped on an annual basis as set out in Annexe 3 ("**Permitted Capex Level**") minus $100mn ("**Agreed Capex Level**").

If as of 31 December of a year during Period 1, 100% of interest for that year has been paid (including any "catch-up" interest if payable as per paragraph 3(d)), the capex of the following year can be increased by $100m versus the Agreed Capex Level, i.e. returned to the Permitted Capex Level.

During Period 2:

Capex to be capped on an annual basis as per the Permitted Capex Level

provided that, if Period 2 interest on the PXF Facility or the Notes is not being kept current, it shall instead be capped at the Agreed Capex Level.

All working capital payments to related parties must be on arms' length normal commercial terms

**9. Fixed principal repayments of PXF**   As per the schedule set out in Annexe 1.

**10. Dividends**   Dividends to be permitted in the maximum amounts of (1) up to $300m p.a. and (2) if more than $75m swept within a quarter then any surplus thereafter, split 1.5:1.0, creditors/equity (with the creditor portion being applied in line with "Cash Sweep / Waterfall"), in each case subject to the following conditions at the time of payment:

(a) the aggregate principal amount outstanding under the restructured Notes and the PXF Facility is no more than 45% of the aggregate principal amount of the Notes and PXFs outstanding as at the time the restructuring is implemented;

(b) Net debt/EBITDA is below 1.5x for four consecutive historic quarters prior to, and pro-forma for, any dividend payment; and

(c) No default is outstanding or would result from such payment.

Once 100% of the outstanding restructured Notes and PXF Facility have been repaid, restrictions fall away.

**11. Permitted Debt / Permitted Liens**   (a) Uncommitted Trade Finance in ordinary course of business secured by current assets at arm's length and on prevailing market terms

(b) Other Secured Finance: maximum $50m at any time outstanding on arm's length terms and secured by fixed charges/pledges over assets/retention of title (other than assets owned by a member of the Collateral Group and excluding shares) and provided that the fair market value[2] of the assets pledged for any single financing does not exceeding 200% of the amount of the principal amount of such financing.

(c) Equipment/vendor financing/ECA financing[3]/financial leasing for purchase of new equipment on market terms (subject to capex limitations to be agreed) and provided that (i) the collateral is limited to a fixed charge/pledge over/retention of title in respect of the acquired equipment and (ii) the aggregate amount of such financings does not exceed $175m at any time outstanding. Any unused amounts under basket (b) is permitted to increase this basket under (c).

(d) Hedging / FX transactions (pledge of deposit/cash cover) incl. guarantee/pledge for 3rd party in each case in the ordinary course

---

[2] Fair market value, above a certain threshold to be agreed, to be subject to confirmation by one of the "big 4" audit firms or other independent financial advisor of international standing, subject to thresholds to be agreed and set out in definitive documentation.
[3] Flexibility for guarantees/sureties for ECA financings to be agreed in final documentation.

provided the amount outstanding does not at any time exceed $50m.

(e) Any debt the proceeds of which are immediately applied to prepay/redeem the PXF Facility and the Notes in full.

(f) Financing by shareholders or affiliates to be permitted in unlimited amounts on unsecured basis and provided fully and unconditionally subordinated until restructured Notes and PXF Facility have been repaid in full (for the avoidance of doubt all financing provided by shareholders and affiliates shall be provided in accordance with this paragraph (f) and not under any of the preceding paragraphs).

(g) Otherwise with consent (consent mechanism and voting thresholds to be set out in definitive documentation).

**12. Consent Fee**      0.75% restructuring fee for all creditors payable on the effective date of the restructuring. Additional 0.75% early bird fee for all consenting creditors who consent by predetermined early bird fee deadline payable one month after the effective date of the restructuring. In the case of the Notes, fees shall be paid to the holders as of the record date established for purposes of voting in connection with the scheme, and the timing of payments remains subject to confirmation as to payment logistics with relevant paying agents and clearing systems, but in any case payments shall not be made earlier than the effective date of the restructuring and no earlier than the date on which the fees are paid to the PXF Lenders.

In the event that extensions to the PXF standstill and the moratorium scheme for the notes are agreed, certain of the fees payable to the PXF lenders and the noteholders in connection with such extensions will be off-set against the restructuring fees, as set out in Annexe 4.

**13. Covenant Package**      Both PXF and Note covenant package to be tightened and the PXF Facility and the Notes in addition to include mandatory prepayment (in the case of the PXF Facility) / buyback offer (in the case of the Notes) upon change of control of Metinvest B.V.; details to be set out in definitive documentation.

**14. Security structure**      PXF: Maintain existing PXF borrowing/surety/security recourse rights (including without limitation and for the avoidance of doubt an uncapped suretyship from Ilyich) ("**Existing PXF Recourse**") plus enhanced PXF security structure by way of an assignment of rights by MISA under offtake contracts (notified to offtakers and with all payments to be made into pledged PXF collection accounts) and assignment of (A) Azovstal's, Yenakiieve's, Ilyich's, InGok's or SevGok's (as applicable) on the one hand and (B) MISA's on the other hand respective rights under relevant export contracts or commission agreements between those parties. For the avoidance of doubt, MISA will not be required to grant a guarantee.

Notes: Maintain existing Notes borrowing/surety/security recourse rights (i.e. Azovstal, Yenakiive Steel, Ingulets GOK, Ilyich (for the avoidance of doubt uncapped), Northern GOK, Central GOK, Avdiivka Coke,

Khartsyzk Pipe and Metalen) ("**Existing Notes Recourse**").

New shared PXFs and Notes recourse rights: Details to be finalised but always so as to maintain existing respective priorities resulting from Existing PXF Recourse and Existing Notes Recourse, and on a *pari passu* basis with respect to new shared recourse rights. To comprise:

(i) the creation of a new intermediate Dutch holdco to be established by Metinvest BV ("**Intermediate Dutch Holdco**") which shall own 100% of the share capital of InGOK and Ilyich owned by the Metinvest group of companies and 50% plus 1 share of Central GOK (Intermediate Dutch Holdco and its subsidiaries together comprising the "**Collateral Group**");

(ii) guarantee in favour of the holders of the Notes and the PXF Lenders from Intermediate Dutch Holdco[4];

(iii) share pledge over 100% of shares of Intermediate Dutch Holdco and security over all intercompany and related party debt owed by Intermediate Dutch Holdco which shall be enforceable upon the occurrence of any Share Pledge Enforcement Default (as defined in Annexe 2). The share pledge over Intermediate Dutch Holdco will be released if:

   a. 100% of Period 1 interest including any PIK interest has been paid in full (including any "catch-up" interest if payable as per paragraph $3(d)$)[5]; and

   b. at least US$250m has been repaid in respect of the aggregate amount of the principal outstanding under the restructured Notes and the PXF Facility; and

   c. none of the events of default which would permit enforcement of the share pledge over Intermediate Dutch Holdco has occurred and is continuing;

(iv) Intermediate Dutch Holdco may be unwound (with all of the shares it owns to be transferred back to Metinvest B.V) if:

   a. 100% of Period 1 interest including any PIK interest has been paid in full (including any "catch-up" interest if payable as per paragraph $3(d)$);

   b. at least US$600m has been repaid in respect of the aggregate amount of the principal outstanding under the restructured Notes and the PXF Facility; and

---

[4]     Intermediate Dutch Holdco guarantee will be automatically released on any unwind of Intermediate Dutch Holdco in accordance with paragraph (iv) below.

[5]     Solely for the purposes of the Intermediate Dutch Holdco pledge release and the unwind of the Intermediate Dutch Holdco, every US$ paid to the PXF lenders and the noteholders in Period 2 over and above interest due in Period 2 in the relevant quarter shall be deemed (without double counting) to discharge any Period 1 PIK-ed interest and thereafter principal under the PXF Facility and the Notes (all without prejudice to the actual operation of the cash waterfall in accordance with the other provisions of these joint terms).

        c. none of the events of default which would permit enforcement of the share pledge over Intermediate Dutch Holdco has occurred and is continuing;

(v) share pledges over 50% plus 1 share of each of InGOK, Ilyich and Central GOK and security over all intercompany and related party debt owed by such companies which shall be enforceable upon the occurrence of any non-payment Event of Default (whether as a result of acceleration or otherwise) that is continuing. The share pledges over InGOK, Ilyich and Central GOK will be released once Metinvest BV becomes entitled to pay dividends (see section 10 "Dividends" above) provided that none of the events of default which would permit enforcement of the share pledges over Ilyich, InGOK or Central GOK has occurred and is continuing;

(vi) pledges of equipment (to be specified) from InGOK, Ilyich and (subject to an intercreditor discussion as regards sharing arrangements) Central GOK ; and

(vii)   offshore debt service account pledges.

In the event that Intermediate Dutch Holdco is unwound prior to any release of the share pledges over Ilyich, InGOK and Central GOK the Group will take all such steps as may be necessary to ensure that the shares in Ilyich, InGOK and Central GOK are re-transferred to Metinvest B.V. subject to the security constituted by such share pledges (or, if it is not legally possible to re-transfer such shares subject to that security, the Group will take all such steps as may be necessary to re-create such security) and that any and all perfection steps as may be required in relation to the maintenance or, as applicable, re-creation and continuing validity of such share pledges are taken.

Protections to be included so as to ensure that assets (including licences) are not moved out from under Intermediate Dutch HoldCo or its subsidiary companies.

Subject to necessary carve outs to be agreed, cash accounts to be held with the agreed common Security Agent or otherwise pledged for the benefit of PXF and Notes (carve-outs necessary for PXF, Trade Finance and operations to be set out in definitive documentation, on a basis similar to PXF Standstill Agreement/Notes moratorium Scheme).

Final documentation will contain restrictions to be agreed on the holding of Group cash with banks affiliated with the Group and/or the shareholders.

Strict negative pledge on all unencumbered assets of the Group including in particular (but without limitation) companies already providing credit support pursuant to Existing PXF Recourse and Existing Notes Recourse subject to carve-outs under Permitted Liens as per section 11 (*Permitted*

*Debt/ Permitted Liens*) above.

Limitation on the granting of new suretyships and guarantees to be set out in definitive documentation.

Existing PXF Recourse and Existing Notes Recourse shall constitute senior and unsubordinated obligations of the relevant obligor.

LMA based intercreditor agreement.

**15. Shareholder Liabilities**

Liabilities owed to the former owners of Ilyich to be paid entirely by shareholder.

All present and future liabilities owed to shareholders and their affiliates (including without limitation any new money) to be lent only to Metinvest B.V. (and not to any of its subsidiaries) and to be fully and unconditionally subordinated until restructured Notes and PXF Facility have been repaid in full. Once 100% of the outstanding restructured Notes and PXF Facility have been repaid (but not in any other circumstance), subordination falls away.

**16. UCC Seller Notes[6]**

UCC Seller Notes to mature no sooner than the New Notes or New PXF Facility. Any payments under the UCC Seller Notes to be fully serviced from the cash-flows of UCC (reflecting a "lock-box" principle), subject to the following:

(i) Metinvest B.V. shall only be permitted to contribute cash to UCC to the extent required to collateralize or fund UCC's reclamation obligations or workers compensation claims, the aggregate amount of such additional contributions not to exceed $45 million[7] less any amount of the existing UCC borrowing base facility which has been extended, to the extent that such extended facility is not required to be cash collateralised;

(ii) The permitted form(s) of cash contribution from Metinvest B.V. or any of its subsidiaries to UCC to be agreed in the definitive documentation;

(iii)No payments (principal, interest or otherwise) on the Seller Notes shall be permitted from the cash contributed by Metinvest B.V. or any of its subsidiaries to UCC starting from the effective date of the restructuring, with a mechanism to be developed in final documentation to ensure that this is the case and that any cash contributions by Metinvest B.V. are, directly or indirectly, exclusively used for operational requirements of UCC and/or cash collateralisation requirements in line with (i) above; and

---

[6]     UCC-related provisions remain subject to further financial diligence of UCC by the PXF Lenders, their advisers, and advisers to the Ad Hoc Committee of bondholders.

[7]     The aggregate amount of UCC's potential reclamation obligations or workers compensation claims is expected to be up to but not more than $59.6 million. Any UCC requirements for collateral or funding of such obligations in excess of the $45 million basket to be funded from existing cash at UCC (including amounts pledged with the reclamation bond insurers or with the agent under existing UCC borrowing base facility, but excluding any contributions from Metinvest B.V.).

(iv) Any unrestricted cash balance at UCC above $15 million (after payments on Seller Notes, if then permitted) to be swept to Metinvest B.V. on a quarterly basis.

| | |
|---|---|
| **17. Corporate Governance/ Monitoring** | Board observer for financial creditors at InGOK, Ilyich and Central GOK but not at the Metinvest BV level. The mandate for, and disclosure rights of, the board observer will be agreed in the definitive documentation. |

As part of information undertakings, the creditors will have a right to ask in writing reasonable questions to the Metinvest BV Board in reasonable frequency and in a consolidated form. The Board's answers thereon will be provided to the creditors subject to a confidentiality undertaking, but will not be published.

Ongoing arrangement for independent monitoring and cash sweep verification.

Provision of information/monitoring (including, without limitation quarterly financials).

Reporting requirements

1. Until end of 2018 – monthly in line with the current Standstill/Moratorium, subject to no forward looking information (save for budgets, which must always be delivered / details to be defined in final documentation) to be provided to the PXF lenders once liquidity becomes less constrained (to be defined in final documentation but to include cash payment of 100% of accrued interest and such other liquidity tests as may be agreed). For the avoidance of doubt, no forward looking information will be required to be provided to holders of the Notes under this reporting requirement

2. From 2019 onwards – quarterly in line with the Standstill/Moratorium

in each case, supplemented with disclosure of capex during the period and restricted and unrestricted cash position as at the applicable determination date and the resulting cash sweep amounts, if any, together with (until further notice and to the PXF lenders) cash flow statements.

| | |
|---|---|
| **18. Implementation** | Single class scheme of Notes. |

Single amendment agreement for PXF.

Governing law: English law.

| | |
|---|---|
| **19. Other** | ECA Facility to be maintained on current terms. |

Fees of legal and financial advisers to the PXF Coordinating Committee and Noteholder Ad Hoc Committee to be paid at closing of the

restructuring or otherwise in accordance with the existing engagement letters.

**20. Group**          For the purposes of these Heads of Terms "Group" means at any time Metinvest B.V. and all of its subsidiaries. "Subsidiary" shall have the meaning consistent with the terms and conditions of the 2017 Notes.

## ANNEXE 1
## PRINCIPAL REPAYMENTS

### PXF Amortisation Schedule (Period 2):
A) Maximum Normalisation Payments

| US$ million | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Normalisation Payments | 16.8 | 16.1 | 15.4 | 14.2 | 12.8 | 11.7 | 10.6 | 9.0 | 7.3 | 5.8 |

*Note: The table above is subject to: (i) the outstanding principal amount of PXF debt, and (ii) the actual LIBOR, as at each calculation date in Period 2.*

B) Fixed Principal Repayments (pre-reduction)

| US$ million | Q1 2019 | Q2 2019 | Q3 2019 | Q4 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Fixed Principal Repayments | 45.3 | 45.3 | 70.3 | 70.3 | 70.3 | 70.3 | 100.3 | 100.3 | 100.3 | 100.3 |

Any repayment of the principal balance of the PXF Facility under Level 4 during Period 1 of the cash sweep in paragraph 6 above will be applied (on a $ for $ basis) as follows:

1. the first $50m, to be applied in reduction of each of the Period 2 fixed amortisation payments under (B) above (but not, for the avoidance of doubt, normalisation payments under (A) above) for the PXF Facility pro rata to the amount of each such amortisation payment; and

2. any additional amounts, to be applied in reduction of each of the Period 2 fixed amortisation payments for the PXF Facility (but not, for the avoidance of doubt, normalisation payments under (A) above) in chronological order.

For the avoidance of doubt any repayment of the principal balance of the Notes under Level 4 during Period 1 of the cash sweep in paragraph 6 above will be applied to reduce principal repayable in respect of the Notes at final maturity on 31 December 2021.

## ANNEXE 2
## SHARE PLEDGE ENFORCEMENT DEFAULTS

If any of these circumstances arise (a "**Share Pledge Enforcement Default**") then the Security Agent will be entitled to enforce the share pledge over the Intermediate Dutch Holdco[8]:

1.      the occurrence of any payment default in respect of a payment of principal, interest or cash sweep amounts, unless remedied within 10 Business Days[9], excluding, for the avoidance of doubt, following any acceleration[10] of the PXF Facility or the restructured Notes save where such acceleration occurs as a result of such payment default or an event of default related to the occurrence of any of the following:

   (a)      any member of the Group takes any action or omits to take any action (acting reasonably and in good faith in the circumstances and to the extent within its reasonable control) where that action or omission would undermine the legality, enforceability or priority of any of the sureties granted by Ukrainian entities or any of the security referred to in paragraph 14 (iii) above;

   (b)      disposal or other distribution of a material part of the assets of the Group and/or the Collateral Group as a whole[11] (including cash), except to the extent that such occurs as a result of circumstances outside the control of the Group; or

   (c)      breach of certain terms of the new subordination agreement relating to financings by shareholders and their affiliates[12] to be entered into in relation to the restructuring[13] or a breach of certain terms of the security documents in relation to the security referred to in paragraph 14 (iii) above (in each case to be agreed subject to any appropriate materiality thresholds and to be specified in more detail in final documentation), except to the extent that such occurs as a result of circumstances outside the control of the Group or the shareholders; or

2.      in respect of (a) Metinvest BV, (b) any entity within the Collateral Group or (c) any other Group entities representing in total more than one-third of the Group's preceding twelve months' consolidated EBITDA:

   (a)      the making of an order for bankruptcy or insolvency proceedings[14] (excluding for the avoidance of doubt any filings, petitions or other preliminary steps or preliminary orders in respect of such proceedings) against the relevant entity or entities, save for (i) any such orders which the relevant entity is contesting in good faith and which are discharged within a period to be agreed and (ii) any such orders resulting from

---

[8]      Applicable grace periods for events of default to be agreed in final documentation.

[9]      We note that this grace period will apply solely to commencement of enforcement of the share pledge over Intermediate Dutch Holdco and not the occurrence of the underlying Event of Default under the PXF Facility.

[10]     Acceleration to be defined to include acceleration of the Notes and any action taken by the PXF finance parties under the equivalent of clause 23.25(a)-(c) (*Acceleration*) of the existing PXF facility agreements.

[11]     For the avoidance of doubt, we note that this only relates to disposals or distributions that result in an event of default occurring (ie those that the company makes in breach of final documentation and any agreed thresholds in final documentation).

[12]     See paragraph 15 above.

[13]     For the avoidance of doubt the new subordination agreement will be a full subordination arrangement without inclusion of the termination events contained in the existing subordination agreements and will be subject only to permitted dividends in accordance with paragraph 10 above.  The relevant terms of the new subordination agreement for this purpose will be based closely on clauses 3 (other than clause 3.9), 4, 5 and 7.2 of the existing (PXF) subordination agreement and the trigger in paragraph (b)(iii) will be limited to those terms and not others.

[14]     I.e. an order for (i) the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer; (ii) the suspension of payments, a moratorium of any indebtedness, winding up, dissolution or administration; or (iii) any analogous proceedings taken in any jurisdiction, all to be specified in more detail in final documentation.

proceedings which are commenced by any of the PXF Lenders, the Note trustee or the holders of the Notes following acceleration of the PXF Facility or the Notes in circumstances where at the time of such acceleration none of the events described in paragraph 1 above has occurred; or

(b)     the relevant entity or entities commence or consent to the commencement of bankruptcy or insolvency proceedings on a voluntary basis; or

3.     final, non-appealable and enforceable court decisions against Group entities representing a loss to the Group of in total more than one-third of the Group's preceding twelve months' consolidated EBITDA.

## ANNEXE 3

### PERMITTED CAPEX LEVEL

| US$ million | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|
| Permitted Capex Level | 601 | 736 | 751 | 775 | 836 | 888 |

## ANNEXE 4

### CONSENT FEE REDUCTION

The restructuring fees payable to the Noteholders and the PXF Lenders under paragraph 12 (the **Restructuring Fees**) shall be reduced in the following circumstances:

(a)     the Restructuring Fees payable to the Noteholders and the PXF Lenders (respectively) shall be reduced by an amount equal to the amount of the Initial Fee actually received by the Noteholders and the PXF Lenders (respectively);

(b)     the Restructuring Fees payable to the Noteholders and the PXF Lenders (respectively) shall be further reduced by an amount equal to the amount of the August Fee and the September Fee actually received by the Noteholders and the PXF Lenders (respectively) unless the advisers to the Noteholder Committee and the PXF Co-ordinating Committee, acting reasonably and in good faith, have jointly provided the Company with English language drafts of the First Principal Transaction Documents by 30 June 2016, the Second Principal Transaction Documents by 15 July 2016 and Third Principal Transaction Documents by 31 July 2016; and

(c)     the Restructuring Fees payable to the Noteholders and the PXF Lenders (respectively) shall be further reduced by an amount equal to 50% of the amount of the October Fee and the November Fee actually received by the Noteholders and the PXF Lenders (respectively) unless the advisers to the Noteholder Committee and the PXF Co-ordinating Committee, acting reasonably and in good faith, have jointly provided the Company with English language drafts of the Principal Transaction Documents by 31 August 2016.

For avoidance of doubt, the reductions contemplated above will apply on an aggregate basis such that the balance of the Restructuring Fees will be allocated among all Noteholders and PXF Lenders (respectively) pro rata.

For the purposes of this Annexe 4:

**First Principal Transaction Documents** means the Terms and Conditions for New Notes, New Notes Surety Agreement(s), New Notes Trust Deed, New Notes Agency Agreement, New PXF Facility Agreement, Shareholder Subordination Agreement(s), Intermediate Dutch Holdco Guarantee(s), Intermediate Dutch Holdco Share Pledge and Intermediate Dutch Holdco intercompany receivables assignment.

**Second Note Moratorium** means the second moratorium scheme for the Notes, as described in the Practice Statement Letter dated 23 May 2016.

**Second Principal Transaction Documents** means pro-forma versions of the New PXF Security Agreements (being a single pro forma new and/or amended Suretyship, a single pro forma Assignment Agreement, a single pro forma new and/or amended local Account Pledge Agreement, and new and/or amended MISA account pledge), a single pro forma Opco Share Pledge, a single pro forma Opco equipment pledge, a single pro forma Offshore debt service account pledge (if and only to the extent determined to be applicable in the opinion of the advisers to the PXF coordinating committee and advisers to the ad hoc committee for the Notes) and a single pro forma Opco intercompany receivables assignment.

**Second Standstill Extension** means the second extension of the standstill arrangements with the PXF Lenders.

**Third Principal Transaction Documents** means the Intercreditor Agreement.

**Principal Transaction Documents** means the First Principal Transaction Documents, the Second Principal Transaction Documents and the Third Principal Transaction Documents.

**Initial Fee** means:

(a)     in the case of the Notes, the 5 basis point fee payable with respect to the principal amount of the Notes outstanding as at the record date for the purposes of the Second Note Moratorium; and

(b)     in the case of the PXF Facility, the 5 basis point fee payable with respect to the principal amount of PXF loans outstanding and held by Consenting PXF Lenders and as described as the "Initial Fee" in the Second Standstill Extension.

**August Fee** means:

(a)     in the case of the Notes, the 7.5 basis point fee payable with respect to the principal amount of the Notes outstanding as at 29 July 2016; and

(b)     in the case of the PXF Facility, the 7.5 basis point fee payable with respect to the principal amount of PXF loans outstanding and held by Consenting PXF Lenders and as described as the "August Fee" in the Second Standstill Extension.

**September Fee** means:

(a)     in the case of the Notes, the 7.5 basis point fee payable with respect to the principal amount of the Notes outstanding as at 31 August 2016; and

(b)     in the case of the PXF Facility, the 7.5 basis point fee payable with respect to the principal amount of PXF loans outstanding and held by Consenting PXF Lenders and as described as the "September Fee" in the Second Standstill Extension.

**October Fee** means:

(a)     in the case of the Notes, the 12.5 basis point fee payable with respect to the principal amount of the Notes outstanding as at 30 September 2016; and

(b)     in the case of the PXF Facility, the 12.5 basis point fee payable with respect to the principal amount of PXF loans outstanding and held by Consenting PXF Lenders and as described as the "October Fee" in the Second Standstill Extension.

**November Fee** means:

(a)     in the case of the Notes, the 12.5 basis point fee payable with respect to the principal amount of the Notes outstanding as at 31 October 2016; and

(b)     in the case of the PXF Facility, the 12.5 basis point fee payable with respect to the principal amount of PXF loans outstanding and held by Consenting PXF Lenders and as described as the "November Fee" in the Second Standstill Extension.

## SCHEDULE 4

## PRINCIPAL TRANSACTION DOCUMENTS

## PART 1

## FIRST PRINCIPAL TRANSACTION DOCUMENTS

The First Principal Transaction Documents referred to in Clauses 3.5(a)(i)(B) and 3.6(b)(ii) and as contemplated by the Non-Binding Restructuring Heads of Terms are as follows:

• Terms and Conditions for New Notes;

• New Notes Surety Agreement(s);

• New Notes Trust Deed;

• New Notes Agency Agreement;

• New PXF Facility Agreement;

• Shareholder Subordination Agreement(s);

• Intermediate Dutch Holdco Guarantee(s);

• Intermediate Dutch Holdco Share Pledge; and

• Intermediate Dutch Holdco intercompany receivables assignment.

## PART 2

## SECOND PRINCIPAL TRANSACTION DOCUMENTS

The Second Principal Transaction Documents referred to in Clauses 3.5(a)(i)(B) and 3.6(b)(ii) and as contemplated by the Non-Binding Restructuring Heads of Terms are as follows:

• Pro-forma versions of the New PXF Security Agreements (being a single pro forma new and/or amended Suretyship, a single pro forma Assignment Agreement, a single pro forma new and/or amended local Account Pledge Agreement and a new and/or amended MISA account pledge);

• A single pro-forma Opco Share Pledge;

• A single pro-forma Opco equipment pledge;

• A single pro-forma Offshore debt service account pledge (if and only to the extent determined to be applicable in the opinion of the advisers to the PXF Co-ordinating Committee and advisers to the Noteholder Committee); and

• A single pro forma Opco intercompany receivables assignment.

# PART 3

## THIRD PRINCIPAL TRANSACTION DOCUMENTS

The Third Principal Transaction Documents referred to in Clauses 3.5(a)(i)(B) and 3.6(b)(ii) and as contemplated by the Non-Binding Restructuring Heads of Terms are as follows:

- Intercreditor Agreement.